Celia ZAPICO et al., Plaintiffs,

v.

BUCYRUS–ERIE CO., Defendant and Third-Party Plaintiff-Appellee,

v.

ATLANTIC CONTAINER LINE, LTD., Third-Party Defendant-Appellant,

and

Antonio Fuet, Third-Party Defendant.

No. 664, Docket 77–7533.

United States Court of Appeals, Second Circuit.

Argued April 10, 1978.

Decided June 15, 1978.

Joseph Arthur Cohen, New York City (Sidney A. Schwartz and Alexander, Ash, Schwartz & Cohen, New York City, of counsel), for third party defendant-appellant, Atlantic Container Line, Ltd.

George R. Hardin, New York City (Neil Reiseman, Douglas R. Kleinfeld and Conway, Reiseman, Michals, Wahl, Bumgardner & Hurley, Newark, N. J., of counsel), for defendant and third party plaintiff-appellee, Bucyrus-Erie Co.

Thomas D. Wilcox, Washington, D. C. (William M. Kimball and Burlingham, Underwood & Lord, New York City, Martin J. McHugh and McHugh, Heckman Smith & Leonard, New York City, of counsel), for National Association of Stevedores, amicus curiae.

Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

The Longshoremen's and Harbor Workers' Compensation Act (LHWCA), as amended in 1972, P.L. 92–576, cuts off the right of a vessel to recover from a concurrently negligent stevedoring company a judgment paid by the vessel to a longshoreman employed by the stevedore in a personal injury suit against the vessel, 33 U.S.C. § 905(b). The 1972 amendments did not, however, deal expressly with such third party actions against stevedores by plaintiffs other than vessels. The primary issue on this appeal is whether a "non-vessel" can recover from a stevedore with whom the non-vessel has been found jointly responsible for injury to the stevedore's employees. The issue has caused considerable division among the district courts. Compare *Spadola v. Viking Yacht Co.*, 441 F.Supp. 798 (S.D.N.Y.1977); *S.S. Seatrain Louisiana v. California Stevedore and Ballast Co.*, 424 F.Supp. 180 (N.D.Cal.1976); *Fitzgerald v. Compania Naviera La Molinera*, 394 F.Supp. 402 (E.D.La.1974) (denying recovery), with the decision in the instant case, 434 F.Supp. 567 (S.D.N.Y.1977); *Gould v. General Mills, Inc.*, 411 F.Supp. 1181 (W.D. N.Y.1976); *Cargill v. United States*, 1977 A.M.C. (E.D.Va.1976); *Crutchfield v. Atlas Offshore Boat Service, Inc.*, 403 F.Supp. 920 (E.D.La.1975) (express indemnity clause); and *Brkaric v. Star Iron & Steel Co.*, 409 F.Supp. 516 (E.D.N.Y.1976) (generally approving recovery). See also *Ocean Drilling & Exploration Co. v. Berry Bros. Oilfield Service, Inc.*, 377 F.2d 511 (5 Cir. 1967), cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118 (1967); *Davis v. Chas. Kurz & Co.*, 483 F.2d 184 (9 Cir. 1973) (denying recovery on theory that "Ryan" indemnity requires a seaworthiness obligation). See generally *Ramirez v. A/S D/A Svendborg*, 75 Civ. 703 (S.D.N.Y. Nov. 22, 1976); *Petrosino v. Wilhelmson*, 75 Civ. 1181 (E.D.N.Y. Oct. 23, 1976); *Nieves v. Douglas Steamship, Ltd.*, 451 F.Supp. 407 (S.D.N.Y. 1978).

On April 12, 1974, Joseph Zapico was killed and Adolfo Millan was injured in an accident aboard the S.S. Atlantic Causeway, a vessel owned by Cunard Steamship Co., Ltd. Zapico and Millan were longshoremen employed by Atlantic Container Line, Ltd. (ACL), a stevedore. The accident occurred during the course of loading a large hydrocrane manufactured by the Bucyrus-Erie Company (Bucyrus). As the vehicle was being driven down a ramp inside the vessel, it went out of control, causing the death of Zapico and injuries to Millan. A jury found that defendant and third party plaintiff Bucyrus negligently manufactured the crane, that third party defendant ACL fur-

nished an incompetent employee to drive it, and that each was 50% responsible for the accident. Judge Owen held these findings supported by the record, stating that the facts were consistent with a conclusion that "while brake failure could have set the tragedy in motion, a competent driver could have taken reasonable steps to avoid it." In so concluding, the judge recognized that the jury also found the driver of the crane, ACL employee Antonio Fuet, not himself "negligent in his driving of the truck-crane, although it found him incompetent to do so."

ACL argued that it was immune from a third party suit since, as a compensation-paying employer, it had no liability under the LHWCA, 33 U.S.C. §§ 905(a), 905(b), beyond the payment of workmen's compensation. Judge Owen rejected this argument, holding that while the Act immunized the stevedore from liability for contribution to Bucyrus, it did not cut off suit for partial indemnity. Although there was no express indemnification agreement nor a direct contractual relationship between ACL and Bucyrus, the court accepted Bucyrus' argument that it was entitled to indemnity either as a third party beneficiary of the implied warranty of workmanlike performance in the stevedoring contract between ACL and the vessel or on a theory of "quasi-contract." The court therefore entered judgment against Bucyrus for the full jury award, and ordered that "upon payment by Bucyrus-Erie Co. of the judgment . . . [it] shall recover from Atlantic Container Line, Ltd. . . . 50% of the amount . . . paid . . . ." Thereafter ACL appealed solely from that portion of the judgment awarding Bucyrus partial recovery against it. Bucyrus did not appeal.

As a preliminary matter, we note ACL's argument that there was "no basis in the record for the finding of any fault" on its part. According to ACL, there were two possible theories embodied in Judge Owen's instructions upon which the jury could find ACL liable. These were that its employee Fuet, the driver of the crane, was himself negligent, or that a signalman negligently gave an all-clear sign to Fuet as he drove down the ramp. ACL argues that since the jury upon a special interrogatory found Fuet not negligent, and there was no evidence that the signalman was an ACL employee, there was no basis for assigning blame to ACL. The trial judge held, however, that the jury's finding of 50% responsibility on the part of ACL was supportable on the basis of its affirmative answer to the question whether ACL "wrongfully failed to provide a competent employee or employees including the driver for the hydrocrane . . . ." Bucyrus argues that this was consistent with the theory that although Fuet on the basis of his abilities was not found negligent, ACL may nevertheless be held for negligence in hiring an employee incapable of exercising the reasonable care required for proper performance of the job, see 8 A.L.R. 574 (1920). There was ample evidence that Mr. Fuet was incompetent to operate a hydrocrane, since he testified that he had never driven one before, never received instruction how to drive one, and could not read instruction booklets printed in English. As we conclude that, even if thus negligent, ACL was not subject to a third party suit by Bucyrus, we need not pass on this claim.

We begin with common ground. Section 905(a) of the LHWCA states:

§ *905 Exclusiveness of liability*

(a) The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death . . . .

ACL and Bucyrus agree that this section immunizes a compensation-paying employer from third party claims for contribution. See, e. g., *American Mutual Liability Insurance Co. v. Matthews*, 182 F.2d 322 (2 Cir. 1950); *Galimi v. Jetco, Inc.*, 514 F.2d 949, 956 (2 Cir. 1975); *Lopez v. Oldendorf*, 545

F.2d 836 (2 Cir. 1976), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2650, 53 L.Ed.2d 256 (1977). However, Bucyrus argues that, as Judge Owen held, neither § 905(a) nor any other section of the Act bars its claim for partial indemnity. Predictably ACL finds this to be a mere semantic distinction without a difference. It will be useful to begin by considering the origins and nature of the two doctrines, although the discussion will necessarily traverse some familiar ground.

■ When two or more persons' torts together cause injury, each is fully liable to the victim. Prosser, Law of Torts § 52, at 314 (4th ed. 1971). Under the principle of contribution, a tortfeasor against whom a judgment is rendered seeks to recover proportional shares of the judgment "from other joint tortfeasors whose negligence contributed to the injury and who are also liable to the plaintiff". *Dawson v. Contractors Transportation Corp.,* 151 U.S.App.D.C. 401, 467 F.2d 727 (1972). The historic bar to this was the common law "rule" that there can be no contribution among joint tortfeasors. The rule had its origin in *Merryweather v. Nixan,* 8 Term.Rep. 186, 101 Eng.Rep. 1337 (K.B.1799), which itself involved intentional rather than negligent action in concert, and both English and early American cases applied the rule only in that context. Early 20th-century American courts began to disregard the caveat and there was soon a firm rule barring apportionment of loss among multiple tortfeasors. See generally Prosser, *supra,* § 50 at 305–06; *Contribution and Indemnity in California,* 57 Calif.L.Rev. 490, 493–94 (1969) [hereinafter *Contribution*]; Davis, *Indemnity between Negligent Tortfeasors,* 37 Iowa L.Rev. 517 (1952). The oft-expressed "rationale" was that as a matter of policy the courts ought not "to make relative value judgments of degrees of culpability among wrongdoers," see *Dole v. Dow Chemical Co.,* 30 N.Y.2d 143, 147, 331 N.Y. S.2d 382, 386, 282 N.E.2d 288, 291 (1972); having been himself a wrongdoer, the defendant unlucky enough to have been sued first had only himself to blame and the courts would not sustain a claim founded upon his own wrong. See generally Leflar,

*Contribution and Indemnity Between Tortfeasors,* 81 U.Pa.L.Rev. 130, 131–35 (1932). It was not until the middle of this century that the rule against contribution was generally abrogated, occasionally by judicial action but more often by statute. See Prosser, *supra,* § 50 at 307; *Contribution, supra,* 57 Calif.L.Rev. at 499.

■ In contrast to the rule against apportionment of damages among joint tortfeasors was the doctrine of indemnity. Under this theory, the tortfeasor who had been cast in judgment sought not a proportionate sharing as in contribution, but rather a shifting of the loss from the one who had been forced to pay it "to the shoulders of another who should bear it instead." Prosser, *supra,* § 51 at 310. Somehow this seemed more palatable to courts operating in the common law tradition. See *Contribution and Indemnity under the Federal Employees' Compensation Act,* 6 U.Toledo L.Rev. 273, 275 (1974); *Rock v. Reed-Prentice,* 39 N.Y.2d 34, 39, 382 N.Y.S.2d 720, 722, 346 N.E.2d 520, 522 (1976).

Indemnity was available on a number of grounds. One, which we may call tort indemnity, was based "merely upon a difference between the kinds of negligence of the two tortfeasors; as for instance, if that of the indemnitee is only 'passive,' while that of the indemnitor is 'active.'" *Slattery v. Marra Bros.,* 186 F.2d 134, 138 (2 Cir.), *cert. denied,* 341 U.S. 915, 71 S.Ct. 736, 95 L.Ed. 1351 (1951). See also *Wallenius Bremen v. United States,* 409 F.2d 994, 998 (4 Cir. 1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970); *Contribution, supra,* 57 Calif.L.Rev. at 499. As Judge Learned Hand perceived, "[s]uch cases may perhaps be accounted for as lenient exceptions to the doctrine that there can be no contribution between joint tortfeasors . . . . When both are liable to the same person for a single joint wrong, and contribution, *stricti juris,* is impossible, the temptation is strong if the faults differ greatly in gravity, to throw the whole loss upon the more guilty of the two." *Id.*

While this tort-based form of indemnity was hardly distinguishable from contribution, two other common forms clearly were. Indemnity could be based either on an express contract of indemnification or on a relationship between the two tortfeasors from which a covenant to indemnify could fairly be implied. See 2A Larson, Workmen's Compensation Law 324, 334 (1976); *Contribution, supra,* 57 Calif.L.Rev. at 492–93. In these areas, the person cast in judgment obtained indemnity not because of joint breaches of a tort duty to the victim as in tort indemnity, see Leflar, *supra,* 81 U.Pa.L.Rev. at 147, but because of a contractual duty owed by the indemnitor to the indemnitee.

Workmen's compensation statutes like the LHWCA added an important new element to the problem because of their exclusive liability sections, as exemplified by 33 U.S.C. § 905(a). Prior to the 1972 amendments, however, judicial interpretation of the viability of contribution and indemnity actions under the LHWCA largely paralleled the early 20th century treatment of these doctrines at common law: contribution was forbidden, but indemnity was permitted although only if contract-based. The leading Supreme Court case on contribution was *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), in which the Court held there was no right of contribution between joint tortfeasors in non-collision maritime cases. Although the Court did not rest its opinion on § 905(a) (then § 905) but rather on the common law rule against contribution, refusing to extend the admiralty doctrine of loss-splitting to non-collision cases in the absence of legislation, later decisions do appear to rest the *Halcyon* non-contribution rule on § 905(a). See *Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), *discussed in Galimi v. Jetco, Inc., supra,* 514 F.2d at 955–56. In any event, this Circuit has long viewed § 905(a) (and the old § 905) as preventing a third party claim for contribution from the employing stevedore, see *Porello v. United States,* 153 F.2d 605 (2 Cir. 1946), *rev'd on other grounds,* 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011 (1947); *American Mutual Liability Ins. Co. v. Matthews, supra,* 182 F.2d 322; *Slattery v. Marra Bros., supra,* 186 F.2d 134; *Lopez v. Oldendorf, supra,* 545 F.2d 836. The cases have relied either on a "linguistic analysis" of the section or on the theory that the statute's elimination of the employer's tort liability to the victim makes it impossible for him to be jointly liable as a tortfeasor with any other party. See *Galimi, supra,* 514 F.2d at 953, 954.

■ Four years after *Halcyon,* the Supreme Court considered the second of the doctrines, indemnity. In *Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that in a suit for indemnity, unlike contribution, a shipowner could recover against a stevedoring contractor amounts paid by the ship to the stevedore's employee in a personal injury suit arising out of the unsafe stowage of cargo. The Court first considered the hypothetical case of a stevedore's express contract to indemnify the shipowner. Justice Burton noted that § 905 made compensation payments the employer's exclusive liability to its employee, or to anyone "claiming under or through such employee, *on account of his injury or death arising out of that employment.*" 350 U.S. at 129, 76 S.Ct. at 235 (emphasis in original). But he stated that in the event of a formal bond of indemnity, the employer's liability

> springs from an independent contractual right. It is not an action by or on behalf of the employee and it is not one to recover damages "on account of" an employee's "injury or death." It is a simple action to recover, under a voluntary and self-sufficient contract . . . .

*Id.* at 130, 76 S.Ct. at 235. This analysis was then extended to the case at bar where no express contract of indemnity existed. The Court held that even without an express contract, the ship could sue based on the warranty of workmanlike performance implied in the contractual relationship between stevedore and shipowner:

The shipowner here holds petitioner's uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product. *Id.* at 133–34, 76 S.Ct. at 237.

\* \* \* \* \* \*

Petitioner's agreement . . . is a contractual undertaking to stow the cargo "with reasonable safety" and thus to save the shipowner harmless from petitioner's failure to do so. *Id.* at 130, 76 S.Ct. at 235.

While the *Ryan* Court expressly did not decide whether a claim based on non-contractual tort indemnity could overcome the § 905 exclusivity clause, *id.* at 133, 76 S.Ct. 232; *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 421 & n.26, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), unlike a contract-based claim such a suit

clearly would be "on account of" the employee's injury[1] and hence a *Ryan*-like analysis would not save it from the force of § 905. Later Supreme Court cases have so intimated, see *Weyerhaeuser S. S. Co. v. Nacirema Operating Co.*, 355 U.S. 563, 569, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), and that is the law of this Circuit, see *Slattery v. Marra Bros., supra*, 186 F.2d at 138–39; *Williams v. Pennsylvania R. R. Co.*, 313 F.2d 203, 210 (1963), as well as of the majority of jurisdictions, see 2A Larson, *supra*, at 394. But cf. *Wallenius Bremen, supra*, 409 F.2d 994 (FECA case). The district judge's reliance on a theory of "quasi contract" was thus misplaced.

Of course, it may be argued that even contractual indemnity is really "on account of" the employee's injury as there would be no indemnity without it; that "the *Ryan* contractual indemnity theory seems to have been in hopeless contradiction with the *Halcyon* no contribution theory," Gilmore & Black, The Law of Admiralty 443 (2d ed. 1975); see generally Cohen & Dougherty, *The 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act*, 19 N.Y.L.F. 587, 592 (1974); that *Ryan* frustrated the intent of the Compensation Act, see Friendly, Federal Jurisdiction: A General View 131–32 (1973); and that therefore, as ACL contends, the distinction between "contribution" and "indemnity" is merely one of semantics.[2] However, these arguments were made in *Ryan* itself, see

---

**1.** Although it is occasionally said that an "active" tortfeasor incurs an implied obligation to reimburse a "passive" tortfeasor, "the origin of the action is in the injury itself and the circumstances surrounding it, and the liabilities that it creates and the indemnity obligation itself spring exclusively from the comparison of the relationships of the two parties to that injury." 2A Larson, *supra*, at 293. See Leflar, *supra*, 81 U.Pa.L.Rev. at 146–47.

**2.** In reply it might be said that Congress had not clearly manifested an intention to cut off suits for indemnity by third parties against employers; after all, it was only the employee who received a *quid pro quo* (compensation payments without the need to prove fault) as a substitute for tort recovery, while third parties (e. g., shipowners before 1972) "received absolutely nothing, and hence should not be impliedly held to have given up rights which

[they] had before." See 2A Larson, *supra*, at 407. Perhaps the root of the problem was neither *Ryan* nor *Halcyon* but rather the Court's decisions in *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and its progeny which allowed injured longshoremen to sue shipowners under the absolute liability "unseaworthiness" doctrine for accidents actually created by the longshoreman's employer, thus necessitating a decision like *Ryan* so that ultimate liability would not rest on the innocent (or relatively innocent) shipowner, as it would have if only *Sieracki* and *Halcyon* stood as law. See p. 721, *infra*. Of course, *Sieracki* itself was no doubt motivated in part by the inadequate level of compensation payments available under LHWCA prior to the 1972 amendments. See generally *Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837, 839–40 (2 Cir. 1977).

350 U.S. at 135, 141, 76 S.Ct. 232 (Black, *J.*, dissenting), and at least until the 1972 amendments the right to contract-based indemnity even against a compensation-paying stevedore was established law. See, e. g., *Weyerhaeuser S. S. Co. v. Nacirema Operating Co., supra*, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; *Waterman S. S. Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); *Porello v. United States, supra*, 153 F.2d at 608; *Rich v. United States*, 177 F.2d 688 (2 Cir. 1949); *American Mutual Liability Ins. Co., supra*, 182 F.2d at 324; *Williams v. Pennsylvania R. R. Co., supra*, 313 F.2d at 210; 2A Larson, *supra*, at 339.

Section 905(b) of the LHWCA, added in 1972, reads in pertinent part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party . . . *and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.*

33 U.S.C. § 905(b) (emphasis added). ACL argues that the italicized phrase was meant not only to reverse *Ryan* on its own facts but to prevent recovery on any indemnity theory, whether express or implied, by any third party plaintiff against a compensation-paying employer. However, the statute explicitly cuts off indemnity only to a "vessel," which was defined by the 1972 amendments as follows:

> The term "vessel" means any vessel upon which . . . any person entitled to benefits under this chapter suffers injury or death . . . and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer or crew member.

33 U.S.C. § 902(21). The general definitional statute, 1 U.S.C. § 3, states:

The word "vessel" includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

Under these definitions, Bucyrus clearly is not a vessel. The legislative history likewise is of no assistance to ACL. It does indicate that § 905(b) was meant to prevent *Ryan* indemnity actions by vessels, but does not mention suits by non-vessels one way or the other. See H.R.Rep.No. 1441, 92d Cong., 2d Sess. (1972), *reproduced in* 3 U.S. Code Cong. & Admin.News pp. 4698, 4701–05 (1972). Neither does ACL necessarily have the better of the legislative policy argument. There is no assurance, as the stevedore claims, that if Congress had considered non-vessels it would have cut them off as well in order to make compensation payments the sole liability of the employer and to stop triangular suits once and for all. The shipowners got a *quid pro quo* for the loss of their indemnity rights. Prior to the 1972 amendments they were liable to injured longshoremen not only for the ship's own negligence but also on a strict liability theory (the "unseaworthiness" doctrine) for conditions which often were actually created by the stevedore. See *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *DeGioia v. United States Lines Co.*, 304 F.2d 421, 425–26 (2 Cir. 1962); footnote 2, *supra*. The 1972 amendments eliminated the unseaworthiness theory and limited vessel liability to negligence[3] in exchange for the surrender of the vessel's indemnity rights. See H.R.Rep.No. 1441, *supra*, 3 U.S.Code Cong. & Admin.News at 4701–05 (1972); *Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837, 840 (2 Cir. 1977). No such *quid pro quo* was offered to non-vessels. Given the clear statutory language and the absence of legislative history at variance with it, we would hesitate to hold that § 905(b) by its own force cuts off the availability of *Ryan* indemnity to a non-vessel in all cases where the concurring negligence of a stevedoring compa-

---

3. This part of § 905(b) reads:
   The liability of the vessel under this subsection [for negligence] shall not be based upon

the warranty of seaworthiness or a breach thereof at the time the injury occurred.

ny has caused injuries to the latter's employees, see generally *Gould v. General Mills, Inc., supra,* 411 F.Supp. at 1183; *Crutchfield v. Atlas, supra,* 403 F.Supp. 920; *Brkaric v. Star Iron, supra,* 409 F.Supp. at 520, for example, although we do not intend these to be exclusive, where there is a direct contractual relationship between the third party and the stevedore or where the third party is designated as a beneficiary of an express contract between the stevedore and a vessel.

However, even if so much should be accepted, Bucyrus still has the heavy burden of finding an implied agreement by the stevedore to indemnify it. As we have already indicated, only contract-based indemnity could overcome the "on account of" language of § 905(a). Here there was no express contract of indemnity between Bucyrus and ACL. Instead, Bucyrus argues that we should focus on the contractual relationship between the stevedore and the vessel, that an implied warranty of workmanlike performance arising out of that relationship still exists although it cannot be enforced by the vessel, and that this extends to the benefit of a third party like itself. It is true that both the Supreme Court and this court have held that a lack of privity does not necessarily bar recovery under a theory of contractual indemnity. See *Crumaday v. J. H. Fisser,* 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); *Waterman S.S. Corp. v. Dugan & McNamara, Inc., supra,* 364 U.S. at 423, 81 S.Ct. 200; *DeGioia v. United States Lines Co., supra,* 304 F.2d at 425; *Williams v. Pennsylvania R.R. Co., supra,* 313 F.2d at 212; *La Capria v. Compagnie Maritime Belge,* 427 F.2d 244 (2 Cir. 1970). See also *United States v. San Francisco Elevator Co.,* 512 F.2d 23 (9 Cir. 1975). However, we have been cited to no authority and we know of no principle that would place Bucyrus within the "zone of responsibility" see *DeGioia, supra,* 304 F.2d at 425, created by ACL's contract with the ship and the warranty implicit therein. The law of contracts relating to third party beneficiaries distinguishes between intended and incidental beneficiaries. The Restatement of Contracts 2d § 133(1) (Tent.Draft No. 4, April 25, 1968) defines the former as follows:

§ 133. Intended and Incidental Beneficiaries.

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the promise manifests an intention to give the beneficiary the benefit of the promised performance.

An "incidental beneficiary" is a beneficiary who is not an intended beneficiary, *id.* § 122(a); he "acquires by virtue of the promise no right against the promisor or the promisee." *Id.* § 147 (Tent.Draft, No. 3, April 18, 1967).

The record does not make clear what relationship Bucyrus had to the ship. Although Judge Owen, 434 F.Supp. at 570, and an *amicus* brief, Brief Amicus Curiae of the National Assoc. of Stevedores at 3, characterize Bucyrus as a "consignor," ACL asserts that "Bucyrus was neither the owner nor ·the shipper of the hydrocrane, but was only a remote manufacturer." Reply Brief at 4. The record does not permit resolution of this conflict. Even if we were to accept that Bucyrus was consignor of the crane, we see nothing to indicate that the stevedore's warranty to the vessel would cover the liability of a consignor for injury to a longshoreman. In each of the cited cases which extended the warranty beyond two-party contractual relations, this was done for the benefit of the ship itself. See *Crumaday, supra,* 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (contract between stevedore and charterer extended for benefit of ship); *Waterman, supra,* 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (contract between consignee and stevedore extended to the ship); *DiGioia, supra,* 304 F.2d 421 (contract between stevedore and army to unload ship at army base); *Williams, supra,* 313 F.2d 203 (contract between stevedore and a second ship

helping to unload the third party plaintiff ship); *La Capria, supra,* 427 F.2d 244, 247 (warranty of freight forwarder extended to ship without express contract when it "had a monopoly on certain piers, . . . knew . . . that the [cargo was] destined to be loaded on the vessel . . . and charged the ship for part of its services . . . ."); *San Francisco Elevator, supra,* 512 F.2d 23 (warranty of contractor to shipyard extended to vessel). In the cited cases it was clear that the warranty was really "for the benefit of the vessel," *Crumaday, supra,* 358 U.S. at 428, 79 S.Ct. at 448, and that the third party plaintiff was "involved in a close working relationship with [the stevedore]," *Williams, supra,* 313 F.2d at 212. Similarly, *Sanderlin v. Old Dominion Stevedoring Corp.,* 385 F.2d 79, 82–83 (4 Cir. 1967), where a ship's cargo checker was allowed to sue a negligent stevedore who had contracted with the ship, went on the basis that allowing the action was proper to avoid "needless and undesirable circuity" and that "[t]he stevedore who makes the warranty to the shipowner cannot escape the knowledge that if his performance is defective, it is the maritime employees of the shipowner who are likely to suffer." It would be going much further to hold that any warranty by ACL contemplated indemnifying consignors (assuming Bucyrus to have been one) whose defective equipment, along with the stevedore's sub-standard performance, caused injury to the stevedore's own employees for whom the latter had provided workmen's compensation. Actually, there is as much—or rather as little—reason to say that ACL was an intended third-party beneficiary of Bucyrus' "warranty" of its product as to say that Bucyrus was an intended third-party beneficiary of ACL's warranty to the ship. In a sense, Bucyrus is asking us to hold a user liable to a manufacturer for the former's negligent use of the latter's defective product. This we decline to do. Cf. 2A Larson, *supra,* at 402 ("But when a purchaser buys a product, does he make an implied contract with the manufacturer to use the goods in such a way as not to bring liability upon the manufacturer? This would be stretching the concept of contract out of all relation to reality.").

Bucyrus also cites us to several Second Circuit cases, e. g., *Munoz v. Flota Merchante, supra,* 553 F.2d 837, which state that placing responsibility on the stevedore is in keeping with the intent of the 1972 amendments because the stevedore is in the best position to prevent accidents. The statements were meant, however, to apply as between the stevedore and a ship being sued for negligence, since the ship normally leaves the stevedore in day-to-day control of operations. Such statements are inapposite to the relation between a stevedore and a manufacturer. The manufacturer can increase his level of care before the goods ever leave his plant, while the stevedore may be unable to protect his men against latent defects in the manufacturer's equipment.

On these facts, therefore, we find that there is simply not enough of a nexus to imply an agreement by ACL to indemnify Bucyrus based on the independent contract between ship and stevedore. If anything, this case presents a weaker argument for so doing than did the portion of *Hartnett v. Reiss Steamship Co.,* 421 F.2d 1011, 1017 (2 Cir.), *cert. denied,* 400 U.S. 852, 91 S.Ct. 49, 27 L.Ed.2d 90 (1970), where we refused to extend one stevedore's warranty to a vessel to benefit a co-stevedore.[4] Cf. *Isbrandtsen Co. v. Local 1291,* 204 F.2d 495 (3 Cir. 1953) (holding that a charterer of a ship delayed in unloading as a result of an unauthorized work stoppage by longshoremen could not recover damages from the longshoremen's union as third-party beneficiary of the union's collective bargaining contract with a marine trade association of which the stevedoring company retained to unload the ship was a member), discussed in *Williams, supra,* 313 F.2d at 212. We therefore have no occasion to consider other arguments made by ACL.

4. The final paragraph of *Hartnett v. Reiss, supra,* 421 F.2d at 1018–19, does not assist Bucyrus. That discussion involved apportionment between co-indemnitors of the ship. There was no such relationship between Bucyrus and ACL.

Bucyrus has asked that, if we should reject the district court's conclusion with respect to partial indemnity, we should nevertheless reduce its liability to its proportionate share of the damages on the basis of other theories that have surfaced in the last decade. These theories, which are based on a feeling that there is something wrong in making the negligent third party bear the whole load, attempt to avoid the stricture against contribution on the part of a compensation-paying employer in *Halcyon v. Haenn, supra,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, by instead reducing the plaintiff's recovery. Under one of these theories, announced in *Murray v. United States,* 132 U.S.App.D.C. 91, 405 F.2d 1361 (1968), a case arising under the Federal Employees' Compensation Act, the court argued that by accepting compensation payments the injured employee had effectively settled 50% of his claim with his negligent employer, thereby correspondingly reducing the liability of the jointly responsible defendant tortfeasor. In *Dawson v. Contractors Transport Corp., supra,* 151 U.S.App.D.C. 401, 467 F.2d 727, the court assumed that the *"Murray credit"* would apply in actions under the LHWCA, which was the applicable workmen's compensation statute in the District of Columbia, although noting that a district court, see *Turner v. Excavation Construction Co.,* 324 F.Supp. 704 (D.D.C.1971) had "articulated some difficulties it had with the *Murray* rule" because of "the apparent inability of an employer, if *Murray* is applied, to obtain reimbursement for payments made under the compensation statute," 33 U.S.C. § 933. See also *Brkaric v. Star Iron & Steel Co., supra,* 409 F.Supp. 516; *Crowshaw v. Koninklijke Nedlloyd,* 398 F.Supp. 1224 (D.Ore.1975); Cohen & Dougherty, *supra,* 19 N.Y.L.F. at 606; Cole-

man, *The 1972 Amendments to the LHWCA: Life Expectancy of an Equitable Credit,* 12 The Forum 683 (Section of Insurance, Negligence and Compensation Law, ABA) (Winter 1977) (generally approving of various formulae reducing plaintiff's recovery). The Ninth Circuit has rejected the *Murray* credit or an alternative that would determine the amount of the "credit" by the proportion of the employer's negligence, *Dodge v. Mitsui Shintaku Ginko K.K. Tokyo,* 528 F.2d 669, 672 (1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *Shellman v. United States Lines,* 528 F.2d 675 (1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1668, 48 L.Ed.2d 177 (1976). See also *Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 759 (E.D.Pa.1973) (three-judge court); *Hubbard v. Great Pacific Shipping Co., Monrovia,* 404 F.Supp. 1242 (D.Ore.1975); Gorman, *The Longshoremen's and Harbor Workers' Compensation Act— After the 1972 Amendments,* 6 J.Marit.L. & Comm. 1, 21 (1974) (rejecting various "equitable credit" schemes). In *Marant v. Farrell Lines, Inc.,* 550 F.2d 142 (1977), a divided Third Circuit surveyed the problem without deciding it; Judge Van Dusen, who objected to the extensive observations, thought that statements in our decision in *Landon v. Lief Hoegh and Co.,* 521 F.2d 756 (2 Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976), would necessarily align us with the Ninth Circuit.[5] A few months after *Marant* a divided panel of the Fourth Circuit proffered a new variation in *Edmonds v. Compagnie Generale Transatlantique,* 558 F.2d 186 (1977), rehearing en banc granted June 30, 1977 and heard on October 6, 1977. Apparently recognizing the tension between the *Murray* credit and the stevedore's compensation lien, see footnote 5, the majority announced

---

5. In *Landon,* 521 F.2d at 760, we stated:

The appellant recognizes at the outset that the Supreme Court in *Pope & Talbot v. Hawn,* 346 U.S. 406, 411–12 [74 S.Ct. 202, 98 L.Ed. 143] (1953) . . . held that section 33 of the Act, 33 U.S.C. § 933, has specific provisions to permit an employer to recoup his compensation payments out of any recovery from a third person negligently causing such injury, and that, in any event, a reduc-

tion of the shipowner's liability to the plaintiff by the amount of the compensation payments would be the substantial equivalent of contribution by the employer, which the Court declined to require in *Halcyon Lines* . . . . The rule still remains that the shipowner may not deduct the compensation payments from the plaintiff's recovery but must pay them to the employer under section 33 of the Act.

a rule whereby the plaintiff would recover from the non-employer tortfeasor an amount determined by multiplying the amount of the judgment by the latter's percentage of fault and adding the compensation payments refundable to the employer. Here the trial judge declined to adopt the *Edmonds* rule, largely on the basis of Judge Van Dusen's prediction of our attitude in *Marant.*

■■ Although, for a reason hereafter stated, Bucyrus' claims are not properly before us, we think that *Landon v. Leif Hoegh* does commit us, see footnote 5, against any "credit" that by considerably reducing the longshoreman's award from a negligent non-employer might impair the right of even a negligent employer fully to recoup his compensation payments out of that award. Indeed we do not see how any other conclusion is possible under *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 412, 74 S.Ct. 202, 98 L.Ed. 143 (1953), which condemned impairment of the stevedore's right of recoupment. *Edmonds* avoids such impairment, although one is still left to wonder why the longshoreman injured by the negligence of a third party should recover less when his employer has also been negligent than when the employer has been without fault. However, we cannot decide on this appeal whether or not to follow *Edmonds*. Application of *Edmonds* in this case would reduce the plaintiffs' recovery from the amounts awarded by the jury to 50% of these amounts plus the compensation repayable to ACL. Unless the latter equals 50% of the judgment,[6] the plaintiffs would receive less under *Edmonds* than the jury awarded; if the repayable compensation does equal 50%, Bucyrus would not benefit from application of *Edmonds*. But Bucyrus took no cross-appeal from the judgment in favor of the plaintiffs and the latter have consequently not been heard.

The rule that a party may support a judgment on a basis not decided or even rejected by the lower court does not go so far as to enable Bucyrus to raise on ACL's appeal from the grant of partial indemnity a claim that the plaintiffs' unappealed judgments against it should be reduced. Compare *United States v. American Railway Express Co.*, 265 U.S. 425, 435–36, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); *Langnes v. Green*, 282 U.S. 531, 535–39, 51 S.Ct. 243, 75 L.Ed. 520 (1931); 9 Moore, Federal Practice ¶ 204.-11[3], at 932–33, with *Whitehead v. American Security & Trust Co.*, 109 U.S.App.D.C. 202, 285 F.2d 282 (1960); *United States v. Bertman*, Doc. No. 28784 (2 Cir. Jan. 31, 1964) (unreported), *cert. denied sub nom. Bertman v. J. A. Kirsh Co.*, 377 U.S. 995, 84 S.Ct. 1913, 12 L.Ed.2d 1047 (1964); 9 Moore, *supra*, ¶ 204.11[4] at 940–41. See *United States v. Reliable Transfer Co.*, 421 U.S. 397, 401 n. 2, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Morley Construction Co. v. Maryland Casualty Co.*, 300 U.S. 185, 57 S.Ct. 325, 81 L.Ed. 593 (1937).

We do not pretend to complete satisfaction with the result we have been compelled to reach. Bucyrus will now be obliged to pay the entire damages although the jury found it only 50% responsible and the employer will recover part or, more likely, all of his compensation payments despite his own 50% responsibility.[7] A court may well feel tempted to cut the Gordian knot and simply apportion liability according to fault on a contribution-like theory, as the New York Court of Appeals did in *Dole v. Dow Chemical Co., supra*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288, despite a section of that state's compensation law almost identical to § 905(a) of the LHWCA. See *Rock v. Reed-Prentice, supra*, 39 N.Y.2d 34, 382 N.Y.S.2d 720, 346 N.E.2d 520 (1976). The district judge was actuated by considerations of this sort. But *Halcyon v. Haenn*

---

6. The verdicts were $113,271 for Millan, and $314,197.50 for Mrs. Zapico and her children after deducting 25% for Zapico's contributory negligence as found by the jury. The record does not show the amount of the compensation payments.

7. Moreover, under 33 U.S.C. § 933(e), when the employee does not institute suit within 6 months of the compensation award, the employer is entitled to recover out of any eventual judgment from a negligent party not only his compensation payments and expenses but also ⅕ of the remaining recovered funds.

prevents us from following *Dole*, we cannot adopt the district court's expanded notion of indemnity, and Bucyrus' failure to cross-appeal precludes us from considering any proposals that would reduce the amount of plaintiffs' judgments even if we were otherwise persuaded to do so.[8]

The judgment is reversed with instructions to dismiss the third-party complaint.

8. A solution preferable either to *Dole*, which fails to give adequate weight to the employer's no fault liability and thus may leave him liable for an amount in excess of statutory compensation payments, or to *Edmonds*, which irrationally reduces an employee's recovery against a third party tortfeasor because of the employer's negligence, would be to allow the longshoreman to recover in full from the negligent third party but to allow the latter to recover from the negligent stevedore the amount of the judgment representing the stevedore's percentage of fault up to but not exceeding the statutory level of compensation payments. When compensation payments have been made, § 33, 33 U.S.C. § 933, would then operate as usual. Under this scheme the employee gets his full damages, the stevedore pays his percentage of the liability but not above the level of the compensation payments which he has bargained for in exchange for his willingness to pay without fault, and the third party is relieved of the obligation to pay the full judgment. However, such a solution seems impossible under the existing case law and statute. See *Halcyon Lines, supra*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, *reversing Baccile v. Halcyon Lines*, 187 F.2d 403 (3 Cir. 1951); *Newport Air Park, Inc. v. United States*, 419 F.2d 342 (1 Cir. 1969), *reversing* 293 F.Supp. 809 (D.R.I.1968).